**IN THE UNITED STATES DISTRICT COURT**
**FOR THE MIDDLE DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| MICHAEL WALKER, | : | Civil No. 3:24-cv-389 |
| Plaintiff | : | (Judge Mariani) |
| v. | : | |
| N.W. ANDERS, *et al.*, | : | |
| Defendants | : | |

**MEMORANDUM**

Plaintiff Michael Walker ("Walker"), an inmate housed, at all relevant times, at the State Correctional Institution, Huntingdon, Pennsylvania ("SCI-Huntingdon"), commenced this civil rights action pursuant to 42 U.S.C. § 1983. (Doc. 1). The remaining claims are a First Amendment retaliation claim against Corrections Food Service Instructor ("CFSI") Anders, and a Fourteenth Amendment procedural due process claim against Hearing Examiner Ellenberger.

Before the Court are the parties' cross-motions for summary judgment pursuant to Federal Rule of Civil Procedure 56. (Docs. 55, 64). Walker's motion for partial summary judgment only seeks judgment on his retaliation claim against Anders. (Docs. 55, 60). Defendants seek judgment in their favor on the following grounds: (1) with respect to the retaliation claim against Anders, Walker cannot demonstrate a causal connection and Anders is entitled to the same decision defense; (2) with respect to the procedural due process claim against Ellenberger, judgment should be granted in favor of Ellenberger

because he did not improperly deny Walker witnesses and Ellenberger's decision was supported by some evidence; (3) Walker failed to exhaust his administrative remedies; and (4) Walker's claim for damages should be limited to only nominal damages. (Docs. 64, 70).

For the reasons set forth below, Walker's motion (Doc. 55) for summary judgment will be denied and Defendants' motion (Doc. 64) for summary judgment will be granted in part and denied in part.

## I. **Statement of Undisputed Facts**[1]

### A. Walker's Statement of Facts

Video recordings exist in this case and captured the events of August 5, 2022, in SCI-Huntingdon's dining hall. (Doc. 56 ¶¶ 1-2; Doc. 67 ¶¶ 1-2). At all relevant times, Walker was employed as a food service worker at SCI-Huntingdon. (*Id.* ¶ 3).

On June 3, 2022, Walker filed a grievance against Defendant Anders, alleging that she used inappropriate language towards him. (*Id.* ¶ 4).

On August 5, 2022, Walker was working in the dining hall at SCI-Huntingdon. (*Id.* ¶ 5). Also on August 5, 2022, Defendant Anders issued misconduct number D434133 against

---

1 Local Rule 56.1 requires that a motion for summary judgment pursuant to Federal Rule of Civil Procedure 56 be supported "by a separate, short, and concise statement of the material facts, in numbered paragraphs, as to which the moving party contends there is no genuine issue to be tried." M.D. PA. LOCAL RULE OF COURT 56.1. A party opposing a motion for summary judgment must file a separate statement of material facts, responding to the numbered paragraphs set forth in the moving party's statement and identifying genuine issues to be tried. *Id.* Unless otherwise noted, the factual background herein derives from the parties' Rule 56.1 statements of material facts. (Docs. 56, 65, 67, 87).

Walker charging him with assault and stating that Walker assaulted Anders by using his right shoulder to strike her in her left shoulder. (*Id.* ¶¶ 6-7).

Walker contends that the videotape evidence supports a finding that Anders' misconduct contained "alternative truths, along with manufactured of prolific lies, fueled with dishonesty, and supported with scurrilous accusations and allegations." (Doc. 56 ¶ 8) (sic). Defendants counter that there is no factual evidence in the video citied by Walker, or any of Walker's other filings, to support this contention. (Doc. 67 ¶ 8).

Defendant Anders did not suffer any physical injuries from the assault. (Doc. 56 ¶ 9; Doc. 67 ¶ 9). Walker asserts that Anders falsely and wrongfully accused him of assault. (Doc. 56 ¶ 9). Defendants maintain that Walker offered no evidentiary support for this contention. (Doc. 67 ¶ 9).

Walker contends that the videotape evidence contradicts Defendants' version of the events on August 5, 2022. (Doc. 56 ¶ 10). Defendants counter that the video shows Walker walking up the serving line, and when he is passing Anders, he shoulder-checks her. (Doc. 67 ¶ 10).

Walker contends that the videotape evidence "shows 'no alleged assault occur[r]ed'." (Doc. 56 ¶ 11). Defendants counter that video clearly depicts Walker sidestepping towards Anders. (Doc. 67 ¶ 11).

The parties agree that a grievance was filed against Defendant Anders prior to the August 5, 2022 incident. (Doc. 56 ¶ 12; Doc. 67 ¶ 12).

The parties also agree that the videotape evidence is authentic and depicts the events of August 5, 2022. (*Id.* ¶ 13).

B. Defendants' Statement of Facts

On August 5, 2022, Walker and Defendant Anders were both working behind the food services counter in the SCI-Huntington dining hall with other inmates. (Doc. 65 ¶ 1; Doc. 87 ¶ 1).

Closed-circuit television ("CCTV") video of the dining hall shows the serving line on the right side of the screen. (*Id.* ¶ 2). Walker is wearing a white prisoner uniform with white pants and a white hairnet and appears at the bottom of the service line at the start of the video. (*Id.* ¶ 3). Anders is wearing a blue officer's uniform and dark pants and a white hat and appears to the far right of the video behind the service line. (*Id.* ¶ 4). At times in the video, Anders moves slightly off screen to the right; however, her blue, black uniform is almost always visible. (*Id.* ¶ 5).

Two other inmates appear in the video behind the counter, who are wearing brown shirts and white pants. (*Id.* ¶ 6). Walker contends that this information is irrelevant to the issue at hand. (Doc. 87 ¶ 6).

Also, another officer in the same blue, black uniform as Anders is seen sitting at a table in the dining hall outside the service counter at the start of the video. (Doc. 65 ¶ 7; Doc. 87 ¶ 7). Walker contends that this information is irrelevant to the issue at hand. (Doc. 87 ¶ 7).

As the video begins, Defendants assert that Walker is leaning on the counter watching Anders and two other inmates converse. (Doc. 65 ¶ 8; Doc. 87 ¶ 8). Walker contends that he was not "watching" Anders. (Doc. 87 ¶ 8). The two other inmates carry a tray and sheet of paper over to the table that Anders is standing at, and all three leave the screen to the right, although one of the inmates is still partially visible on the right edge of the screen. (Doc. 65 ¶ 9; Doc. 87 ¶ 9). Walker contends that this information is irrelevant to the issue at hand. (Doc. 87 ¶ 9).

Defendants contend, at this point, there is a clear path for Walker to walk up the counter line and exit the area; however, he continues to watch Anders and the other two inmates. (Doc. 65 ¶ 10 Doc. 87 ¶ 10). Walker contends that this information is irrelevant to the issue at hand. (Doc. 87 ¶ 10).

There is a clear path to exit the service line at the bottom of the camera frame at all times in the video. (Doc. 65 ¶ 11; Doc. 87 ¶ 11). Walker contends that this information is irrelevant to the issue at hand. (Doc. 87 ¶ 11).

The two inmates return to camera frame and are blocking the service line. (Doc. 65 ¶ 12; Doc. 87 ¶ 12). Walker contends that this information is irrelevant to the issue at hand. (Doc. 87 ¶ 12).

Anders can be seen moving just off frame as her blue, back uniform contrasts over the other inmate's white pants. (Doc. 65 ¶ 13; Doc. 87 ¶ 13). Walker begins to walk up the service line toward Anders and the other two inmates. (*Id.* ¶ 14). Defendants assert that,

as Walker approaches Anders, he takes quick steps to the right and impacts her; again, they contend that her blue, black uniform is clearly visible along the right edge of the video frame. (Doc. 65 ¶ 15). Walker counters that he did not make any contact with Anders. (Doc. 87 ¶ 15).

Defendants maintain that Walker stumbles forward slightly from the impact and the other two inmates immediately turn to face Anders. (Doc. 65 ¶ 16). Walker contends that this information is misleading and inaccurate. (Doc. 87 ¶ 16).

The other two inmates point at something on the counter and shrug their hands. (Doc. 65 ¶ 17). Walker contends that this information is irrelevant to the issue at hand. (Doc. 87 ¶ 17).

Walker walks back down the service line walking between the two inmates without bumping into either of them, grabs something from the counter, and motions towards Anders. (Doc. 65 ¶ 18). Walker contends that this information is irrelevant to the issue at hand. (Doc. 87 ¶ 18).

Defendants assert that Anders walks up the service line and converses with another officer also wearing a blue shirt and dark pants. (Doc. 65 ¶ 19). During this conversation, the other officer leans over the counter and looks in Walker's direction and Walker points towards Anders and the right side of the screen. (*Id.* ¶ 20). Walker "denie[s]" these statements. (Doc. 87 ¶¶ 19-20).

Following her conversation with the other officer, Anders leaves the service line and exits the dining hall to the top of the screen. (Doc. 65 ¶ 21). Walker contends that this information is irrelevant to the issue at hand. (Doc. 87 ¶ 21).

A different camera captures the scene from outside the service counter. (Doc. 65 ¶ 22; Doc. 87 ¶ 22). Anders' white hat can be seen just above the opaque barrier, Walker (wearing all white) can be seen leaning on the counter. The other two inmates are slightly obstructed by the opaque barrier, but their brown uniforms are visible, and the other officer is visible in the dining hall area. (*Id.* ¶ 23).

Defendants contend that as Walker moves past Anders, the video shows her white hat jerking to the left from Walker body checking her. (Doc. 65 ¶ 24). Walker contends that this statement is inaccurate and misleading. (Doc. 87 ¶ 24).

Shortly thereafter, Anders issued misconduct D434133 against Walker for assault, writing "verified by CCTV, inmate Walker was watching me behind the serving line, when I stopped at the cabinet, inmate Walker took two steps to the right and struck me in my left shoulder with his right shoulder." (Doc. 65 ¶ 25; Doc. 87 ¶ 25).

Walker filled out the DC-141, part 2(A) form requesting review of the CCTV footage and identifying Food Service Director Pittsinger as a witness for Anders' purported retaliatory motive. (Doc. 65 ¶ 26; Doc. 87 ¶ 26). Hearing Examiner Ellenberger indicated that he would review the video evidence but denied Pittsinger as a witness because he was not present during the incident. (Doc. 65 ¶ 27; Doc. 87 ¶ 27).

Defendants assert that Walker did not identify either of the two other inmates present on the video as witnesses. (Doc. 65 ¶ 28). Walker contends that this statement is irrelevant and misleading. (Doc. 87 ¶ 28).

In his DC-141, part 2(C) Inmate Version, the parties agree that Walker denied ever making physical contact with Anders and alleged that he believed the misconduct was retaliatory because he filed a prior grievance against Anders. (Doc. 65 ¶ 29; Doc. 87 ¶ 29).

At the misconduct hearing, Walker reiterated his inmate version and Ellenberger reviewed the video. (Doc. 65 ¶ 30; Doc. 87 ¶ 30). Ellenberger's summary of the video reads "Inmate Walker can be seen leaning against the serving line watching [Anders] at the muffin cabinet/cart. After the two inmates near the cabinet clear from the area, Inmate Walker is seen walking towards where Anders is standing, side stepping, and making physical contact with Anders [with] his right shoulder area as he walks past." (*Id.* ¶ 31). Walker admits that "the videotape evidence is 'undisputed' and depict[s] the events as occurred[,]" but denies that he "took two steps to the right and struck Anders in her left shoulder with his right shoulder." (Doc. 87 ¶ 31). Ellenberger found Walker guilty of assault and sanctioned him to 60-days Disciplinary Custody ("DC"). (Doc. 65 ¶ 32; Doc. 87 ¶ 32).

Walker appealed Misconduct D434133, asserting that the CCTV footage viewed in the totality of the circumstances did not show by a preponderance of evidence that the assault occurred. (Doc. 65 ¶ 33; Doc. 87 ¶ 33). Walker also appealed claiming that the punishment was not proportionate to the offense. (*Id.* ¶ 34). Walker contends that, in his

appeal, he also claimed that there was "insufficient evidence to support Ellenberger's findings." (Doc. 87 ¶ 34).

Defendants assert that Walker did not appeal based on improper procedures, the denial of Pittsinger as a witness, or based on the purported retaliatory motive of Anders. (Doc. 65 ¶ 35). Walker counters that this statement contains inaccurate information about the DC-ADM 801 appeal procedure. (Doc. 87 ¶ 35).

On June 3, 2022, two months prior to this incident, Walker submitted Grievance 984093 against Anders claiming that she used inappropriate language when speaking to him. (Doc. 65 ¶ 36; Doc. 87 ¶ 36). Grievance 984093 was investigated by Pittsinger who interviewed both Walker and Anders separately on June 13, 2022. (*Id.* ¶ 37). Pittsinger denied Grievance 984093 because he believed Anders' account of events. (*Id.* ¶ 38).

On August 10, 2022, Walker submitted Grievance 994211, asserting that Anders retaliated against him for Grievance 984093 by charging him with Misconduct D434133 on August 5, 2022. (Doc. 65 ¶ 39; Doc. 87 ¶ 39). Grievance 994211 was rejected at all stages of appeal, because it concerned a misconduct and thus must be addressed through the DC-ADM 801 misconduct policy for misconduct appeals. (*Id.* ¶ 40). Nowhere in Grievance 994211 or his appeals of Misconduct D434133 did Walker request monetary relief. (Doc. 65 ¶ 41; Doc. 87 ¶ 41). Walker contends that DC-ADM 801 "contains 'no monetary request clause/provision.'" (Doc. 87 ¶ 41).

## II. Legal Standard

Through summary adjudication, the court may dispose of those claims that do not present a "genuine dispute as to any material fact." FED. R. CIV. P. 56(a). "As to materiality, . . . [o]nly disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

The party moving for summary judgment bears the burden of showing the absence of a genuine issue as to any material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). Once such a showing has been made, the non-moving party must offer specific facts contradicting those averred by the movant to establish a genuine issue of material fact. *Lujan v. Nat'l Wildlife Fed'n*, 497 U.S. 871, 888 (1990). Therefore, the non-moving party may not oppose summary judgment simply on the basis of the pleadings, or on conclusory statements that a factual issue exists. *Anderson*, 477 U.S. at 248. "A party asserting that a fact cannot be or is genuinely disputed must support the assertion by citing to particular parts of materials in the record . . . or showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact." FED. R. CIV. P. 56(c)(1)(A)-(B). In evaluating whether summary judgment should be granted, "[t]he court need consider only the cited materials, but it may consider other materials in the record." FED. R. CIV. P. 56(c)(3). "Inferences should be drawn in the light most favorable to the non-

moving party, and where the non-moving party's evidence contradicts the movant's, then the non-movant's must be taken as true." *Big Apple BMW, Inc. v. BMW of N. Am., Inc.*, 974 F.2d 1358, 1363 (3d Cir.1992), *cert. denied* 507 U.S. 912 (1993).

However, "facts must be viewed in the light most favorable to the nonmoving party only if there is a 'genuine' dispute as to those facts." *Scott v. Harris*, 550 U.S. 372, 380, 127 S. Ct. 1769, 1776, 167 L. Ed. 2d 686 (2007). If a party has carried its burden under the summary judgment rule,

> its opponent must do more than simply show that there is some metaphysical doubt as to the material facts. Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no genuine issue for trial. The mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no genuine issue of material fact. When opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment.

*Id.* (internal quotations, citations, and alterations omitted).

Courts are permitted to resolve cross-motions for summary judgment concurrently. *See Lawrence v. City of Phila.*, 527 F.3d 299, 310 (3d Cir. 2008); *see also Johnson v. Fed. Express Corp.*, 996 F.Supp.2d 302, 312 (M.D. Pa. 2014); 10A Charles Alan Wright *et al.*, *Federal Practice and Procedure* § 2720 (3d ed. 2015). When doing so, the court is bound to view the evidence in the light most favorable to the non-moving party with respect to each motion. FED. R. CIV. P. 56; *Lawrence*, 527 F.3d at 310 (quoting *Rains v. Cascade Indus., Inc.*, 402 F.2d 241, 245 (3d Cir. 1968)).

## III. Discussion

### A. Administrative Exhaustion[2]

The Prison Litigation Reform Act of 1995 ("PLRA"), 42 U.S.C. § 1997e *et seq.*, requires prisoners to exhaust available administrative remedies before suing prison officials for alleged constitutional violations. *See id.* § 1997e(a); *Ross v. Blake*, 578 U.S. 632, 639, 642 (2016) (explaining that only "available" remedies must be exhausted). The PLRA "exhaustion requirement applies to all inmate suits about prison life, whether they involve general circumstances or particular episodes, and whether they allege excessive force or some other wrong." *Porter v. Nussle*, 534 U.S. 516, 532 (2002). It has been made clear that the exhaustion requirement is mandatory. *See Williams v. Beard*, 482 F.3d 637, 639 (3d Cir. 2007); *see also Booth v. Churner*, 532 U.S. 731, 741 (2001) (holding that the exhaustion requirement of the PLRA applies to grievance procedures "regardless of the relief offered through administrative procedures"); *Nyhuis v. Reno*, 204 F.3d 65, 67 (3d Cir. 2000) (same). "[I]t is beyond the power of [any] court...to excuse compliance with the exhaustion requirement." *Nyhuis*, 204 F.3d at 73 (quoting *Beeson v. Fishkill Corr. Facility*, 28 F. Supp. 2d 884, 894-95 (S.D.N.Y. 1998)).

---

[2] Because Defendants raised the issue of exhaustion of administrative remedies, the Court issued an Order notifying the parties that it would consider exhaustion in its role as factfinder in accordance with *Paladino v. Newsome*, 885 F.3d 203 (3d Cir. 2018) and *Small v. Camden Cnty.*, 728 F.3d 265 (3d Cir. 2013), and afforded the parties the opportunity to supplement the record with any additional evidence relevant to exhaustion of administrative remedies. (Doc. 80).

To exhaust administrative remedies an inmate must comply with all applicable grievance procedures and rules. *Spruill v. Gillis*, 372 F.3d 218, 231 (3d Cir. 2004). The PLRA requires not only technical exhaustion of the administrative remedies, but also substantial compliance with procedural requirements. *Spruill*, 372 F.3d at 227-32; *see also Nyhuis*, 204 F.3d at 77-78. A procedural default by the prisoner, either through late or improper filings, bars the prisoner from bringing a claim in federal court unless equitable considerations warrant review of the claim. *Spruill*, 372 F.3d at 227-32; *see also Camp v. Brennan*, 219 F.3d 279 (3d Cir. 2000). A procedural default may be excused, however, if the prisoner can show that the administrative remedies were unavailable to him. *See Rinaldi v. United States*, 904 F.3d 257, 266 (3d Cir. 2018) (stating that "[t]he PLRA requires only 'proper exhaustion,' meaning exhaustion of those administrative remedies that are 'available'" (quoting *Woodford v. Ngo*, 548 U.S. 81, 93 (2006)). "An administrative remedy is unavailable when it "operates as a simple dead end[,]...is so opaque that it becomes, practically speaking, incapable of use, or when prison administrators thwart inmates from taking advantage of a grievance process through machination, misrepresentation, or intimidation.'" *Downey v. Pa. Dep't of Corr.*, 968 F.3d 299, 305 (3d Cir. 2020) (quoting *Shifflett v. Korszniak*, 934 F.3d 356, 365 (3d Cir. 2019)).

### 1. DC-ADM 804: Inmate Grievances

DC-ADM 804 describes the administrative remedies for inmate grievances. DC-ADM 804 defines a "grievance" as "[a] formal written complaint by an inmate related to a

problem encountered during the course of his/her confinement." Commonwealth of Pa., Dep't of Corr., Inmate Grievance Sys., Policy No. DC-ADM 804 ("DC-ADM 804"), Glossary of Terms, available at: https://www.pa.gov/content/dam/copapwp-pagov/en/cor/documents/about-us/doc-policies/804%20Inmate%20Grievances.pdf. DC-ADM 804 provides a three-step grievance process that must be completed to properly exhaust administrative remedies in most cases. *Id.*; *see also Booth v. Churner*, 206 F.3d 289, 292 n.2 (3d Cir. 2002). If informal resolution attempts do not resolve the problem, the first step is to file a written grievance (using form DC-804, Part 1) with the Facility Grievance Coordinator within 15 working days after "the event upon which the claim is based." DC-ADM 804 § 1(A)(3)-(5). An adverse decision by the Grievance Coordinator may be appealed to the Facility Manager within 15 working days of the initial-review response or rejection. Id. § 2(A)(1). Finally, the decision of the Facility Manager may be appealed to "Final Review" with the Secretary's Office of Inmate Grievances and Appeals, and again must be submitted within 15 working days of the date of the Facility Manager's decision. Id. § 2(B)(1).

DC-ADM 804 has specific requirements for grievances submitted by inmates. Those requirements include, among other things, that the grievance "be legible [and] understandable"; "include a statement of the facts relevant to the claim" as well as "the date, approximate time, and location of the event(s) that gave rise to the grievance"; that the prisoner "identify individuals directly involved in the event(s)"; and that the grievance include

"the specific relief sought," including "compensation or other legal relief normally available from a court." *Id.* § 1(A)(11).

DC-ADM 804 lists three exceptions—issues that are not grievable under its provisions. Specifically, Section VI.H. provides that initial review of "issues concerning" DOC policy DC-ADM 801, i.e., inmate discipline, are not covered under DC-ADM 804. *Id.* § 1(A)(7). In other words, DC-ADM 804 explicitly states that "issues concerning" inmate discipline are not grievable under DC-ADM 804. *Id.*

**2. DC-ADM 801: Inmate Discipline**

DC-ADM 801 covers inmate discipline. Commonwealth of Pa., Dep't of Corr., Inmate Discipline, Policy No. DC-ADM 801 ("DC-ADM 801"), available at: https://www.pa.gov/content/dam/copapwp-pagov/en/cor/documents/about-us/doc-policies/801-inmate-discipline.pdf. Whereas a grievance is initiated by an inmate, inmate discipline is initiated by a member of the prison staff filing a written misconduct report. *Id.* § 1(B). While less serious offenses are subject to informal resolution, more-serious offenses are resolved through formal channels. *Id.* § 1(A)(1). This involves a misconduct hearing before a Hearing Examiner who determines whether the inmate is guilty of the alleged violation. *Id.* §§ 2, 4. Findings of not guilty are recorded in writing and require no rationale. *Id.* § 4(A)(3). Findings of guilty, however, require the preparation of a written summary of the hearing, which includes the facts the Hearing Examiner relied upon in reaching his or her decision. *Id.* § 4(A)(4).

DC-ADM 801 provides three levels of possible review. *Id.* § 4. After a finding of guilty, the inmate has 15 days to submit a written appeal to the Program Review Committee ("PRC"). *Id.* § 4(A)(4). There are only three valid bases for an appeal: (1) that the procedures employed were contrary to law or DOC directives or regulations; (2) that the punishment is disproportionate to the offense; or (3) that the findings of fact were insufficient to support the decision. *Id.* § 5(B)(1).

Inmates are not allowed to appeal findings of not guilty and if they pled guilty then they may appeal only on the first two grounds. *Id.* § 5(A)(2). After the PRC issues its decision, the inmate then has seven days to appeal to the Facility Manager. *Id.* § 5(B). Once the Facility Manager makes his or her decision, the inmate then has seven days to appeal to the DOC Chief Hearing Examiner's Office, Office of Chief Counsel, which provides the final level of review. *Id.* § 5(C).

### 3. Discussion

The United States Court of Appeals for the Third Circuit has recognized that "the inmate grievance process [under DC-ADM 804] and the inmate discipline process [under DC-ADM 801] are two separate tracks, the mixing of which is specifically forbidden: 'A grievance directly related to a specific inmate misconduct charge…will not be addressed through the Inmate Grievance System and must be addressed through Department policy DC-ADM 801, "Inmate Discipline."'" *Howard v. Chatcavage*, 570 F. App'x 117, 119 (3d Cir. 2014) (quoting DC-ADM 804 and citing DOC Inmate Grievance System Procedures Manual

at § 1.A.7). Conversely, where the grievable incident is not related to the disciplinary process, the procedure in DC-ADM 804 still governs. *Robinson v. Southers*, No. 13-1603, 2020 WL 9886298, at *8 (M.D. Pa. Apr. 2, 2020), *report and recommendation adopted as modified*, 2021 WL 2270677 (M.D. Pa. June 3, 2021) (applying *Howard* to hold that "an inmate may not take up a grievance through the appeals track for a misconduct citation").

Defendants argue that where an allegedly grievable incident directly relates to a disciplinary proceeding, DC-ADM 801 is the required procedure an inmate must follow to exhaust his institutional remedies. (Doc. 70, at 20-22). Defendants note that Walker filed Grievance Number 994211 under DC-ADM 804, alleging that Anders retaliated against him by charging him with Misconduct D434133. (*Id.* at 22). Grievance Number 994211 was rejected at all stages of appeal, because it concerned a misconduct and must be addressed through DC-ADM 801. (*Id.*). The record reflects that Walker did indeed pursue his claim under DC-ADM 801.

Defendants argue that Walker failed to exhaust his administrative remedies under DC-ADM 801 because: (1) after Walker was found guilty of the misconduct charges, his appeal of Misconduct D434133 did not include his allegations of retaliation by Anders or his allegations of due process violations by Ellenberger; and (2) Walker's appeals of Misconduct D434133 did not request monetary damages for relief. (*Id.*).

In reply, Walker asserts that his claim based on the misconduct must be addressed through DC-ADM 801. (Doc. 86, at 30-31). He maintains that DC-ADM 801 contains three

bases for an appeal: (1) that the procedures employed were contrary to law or DOC directives or regulations; (2) that the punishment is disproportionate to the offense; or (3) that the findings of fact were insufficient to support the decision. (*Id.*; *see also* DC-ADM 801 § 5(B)(1). Walker asserts that he appealed under the latter two subsections, and that he thus properly appealed his misconduct. (Doc. 86, at 31-32). Walker maintains further that DC-ADM 801 does not contain a "request for damages provision." (*Id.*).

The law in the Third Circuit is unsettled when it comes to retaliation claims based on allegedly fabricated misconducts issued by state prison officials. *See Grisby v. McBeth*, 810 F. App'x 136, 138 n.1 (3d Cir. 2020) (noting that there is a "serious question" whether administrative remedies are available to exhaust prisoner retaliation claims based on adverse action of misconduct charge). This is primarily because under DC-ADM 804, prison officials will often reject grievances that challenge or even mention misconducts and will instead direct prisoners to operate through DC-ADM 801 to challenge any misconduct-related issue. *See id.* at 139; DC-ADM § 804 § 1(A)(7).

However, as stated, an appeal through DC-ADM 801 is expressly limited by the relevant DOC forms to claiming that: (1) "the procedures employed were contrary to law, Department directives, or regulations"; (2) "the punishment is disproportionate to the offense"; or (3) "the findings of fact were insufficient to support the decision." DC-ADM 801 § 5(B)(1). It is unclear whether an inmate could successfully assert that a misconduct was

fabricated as retaliation for protected First Amendment conduct under any of these three specific appeal categories.

In the appeals of Misconduct D434133, Walker challenged the misconduct he received, claiming that the CCTV footage viewed in the totality of the circumstances did not show by a preponderance of evidence that the assault occurred, and that the punishment was not proportionate to the offense. (Doc. 65-3, at 7, 9). The record reflects that Walker pursued the DC-ADM 801 appeal process through final appeal. (Doc. 65-3, at 9-10). Accordingly, the Court cannot conclude as a matter of law that Walker failed to exhaust his claims against Anders and Ellenberger under DC-ADM 801. The Court declines to grant summary judgment in favor of Defendants on the basis of exhaustion.

B. First Amendment Retaliation Claim against Anders

To state a retaliation claim under the First Amendment, a plaintiff bears the burden of satisfying three elements. First, a plaintiff must prove that he was engaged in constitutionally protected activity. *See Rauser v. Horn*, 241 F.3d 330, 333 (3d Cir. 2001). Second, a plaintiff must demonstrate that he "suffered some 'adverse action' at the hands of prison officials." *Id.* (quoting *Allah v. Seiverling*, 229 F.3d 220, 225 (3d Cir. 2000)). This requirement is satisfied by showing adverse action "sufficient 'to deter a person of ordinary firmness' from exercising his First Amendment rights." *Id.* (quoting *Suppan v. Dadonna*, 203 F.3d 228, 235 (3d Cir. 2000)). Third, a prisoner must prove that "his constitutionally protected conduct was 'a substantial or motivating factor' in the decision to discipline him."

*Rauser*, 241 F.3d at 333-34 (quoting *Mount Healthy City Sch. Dist. Bd. of Educ. v. Doyle*, 429 U.S. 274, 287 (1977)). This third element is often referred to as "causation."

There are different ways to prove causation for a First Amendment retaliation claim. One method is to show "unusually suggestive" timing between the protected conduct and the adverse action. *See Lauren W. ex rel. Jean W. v. DeFlaminis*, 480 F.3d 259, 267 (3d Cir. 2007). When a plaintiff relies solely on circumstantial evidence of temporal proximity at summary judgment, the time between the protected conduct and the adverse action is often measured in days rather than weeks or months. *See Conard v. Pa. State Police*, 902 F.3d 178, 184 (3d Cir. 2018). However, "there is not a bright line rule limiting the length of time that may pass between a plaintiff's protected speech and an actionable retaliatory act by a defendant." *Id.* Another approach is to demonstrate "a pattern of antagonism coupled with timing." *DeFlaminis*, 480 F.3d at 267. Finally, causation can be inferred "from the evidence gleaned from the record as a whole." *Watson v. Rozum*, 834 F.3d 417, 424 (3d Cir. 2016) (citing *Farrell v. Planters Lifesavers Co.*, 206 F.3d 271, 281 (3d Cir. 2000)). A plaintiff asserting retaliation "will have to show...that the decision maker had knowledge of the protected activity[.]" *Moore v. City of Philadelphia*, 461 F.3d 331, 351 (3d Cir. 2006) (citation omitted).

If a prisoner establishes a *prima facie* case of retaliation, the burden shifts to prison officials to show, by a preponderance of the evidence, that "they would have made the same decision absent the protected conduct for reasons reasonably related to a legitimate

penological interest." *Rauser*, 241 F.3d at 334. "This is often referred to as the 'same decision defense." *Watson*, 834 F.3d at 422. If the prison officials can make this showing, it defeats the retaliation claim. *See Carter v. McGrady*, 292 F.3d 152, 159 (3d Cir. 2002).

Defendants argue that Walker cannot establish causation for his claims, and they additionally raise the "same decision" defense. (Doc. 66, at 9-12; Doc. 70, at 14-17).

Defendants' first argument with respect to causation is that Walker cannot proffer any evidence of timing plus other evidence necessary to demonstrate a causal connection. (Doc. 66, at 9-12; Doc. 70, at 15-16). There is no dispute that Walker's filing of a grievance was protected conduct and that the issuance of a misconduct that resulted in discipline could be considered adverse action. The question is whether Walker can establish a causal link between his protected conduct and the misconduct issued by Defendant Anders.

The Court finds that Walker has not presented evidence of temporal proximity. Although Walker filed a grievance against Defendant Anders on June 3, 2022 (that was the purported motivation for Anders' alleged retaliatory conduct), that grievance was filed two months before the misconduct was issued on August 5, 2022, and therefore does not provide "unusually suggestive timing" with respect to the retaliatory act. *See Carroll v. Clifford Township*, 625 F. App'x 43, 49 (3d Cir. 2015) ("little more than a month" between protected activity and adverse action, without more, was not unusually suggestive); *LeBoon v. Lancaster Jewish Cmty. Ctr. Ass'n*, 503 F.3d 217, 233 (3d Cir. 2007) ("Although there is no bright line rule as to what constitutes unduly suggestive temporal proximity, a gap of

three months between the protected activity and the adverse action, without more, cannot create an inference of causation to defeat summary judgment."); *Williams v. Phila. Hous. Auth. Police. Dep't*, 380 F.3d 751, 760 (3d Cir. 2004) (two-month lapse between protected activity and adverse action is too long to permit an inference of causation).

The Court has also considered whether the record shows a pattern of antagonistic behavior coupled with timing that links the protected activity and retaliatory action. The Court finds there is a genuine dispute of material fact as to whether any antagonism existed between Walker and Defendant Anders. In Walker's brief in support of his motion for partial summary judgment and in his brief in opposition to Defendants' motion for summary judgment, Walker "asserts, under oath, that Anders had repeatedly and explicitly harassed and threatened him with retaliation for filing a grievance." (Doc. 86, at 18; *see also* Doc. 60, at 15, stating "[t]hroughout the summ[]er of 2022, [Walker] asserts that Anders continued to harass him"). Walker did not execute these briefs under penalty of perjury pursuant to 28 U.S.C. § 1746.[3] (*See* Docs. 60, 86). However, within his briefs, Walker points to his own complaint (Doc. 60, at 15; Doc. 86, at 18 (citing Doc. 1 ¶¶ 15, 22, 25, 30, 36)), which he did execute under penalty of perjury pursuant to 28 U.S.C. § 1746. (Doc. 1, at 54). The United States Court of Appeals for the Third Circuit recently held that an inmate's document executed under penalty of perjury pursuant to 28 U.S.C. § 1746 "provided enough proof to

---

[3] Walker submitted one declaration, but this declaration does not speak to a pattern of antagonistic behavior coupled with timing. (*See* Doc. 56-6).

create a genuine issue of material fact…" *Timmons v. Bohinski*, --- F.4th ----, 2026 WL 2331684, at *3-4 (3d Cir. Aug. 12, 2026). This is not a simple case in which Walker can rely on temporal proximity. However, the Court finds that the record demonstrates a pattern of antagonism coupled with timing sufficient to establish the required causal link. Thus, Walker has made out a prima facie case.

In the event that Walker has established a prima facie case of retaliation, Defendants contend that they "would have made the same decision absent the protected conduct for reasons reasonably related to a legitimate penological interest." (Doc. 70, at 16) (citing *Rauser*, 241 F.3d at 334).

"In general, 'most prisoners' retaliation claims will fail if the misconduct charges are supported by the evidence' because courts afford prison officials 'great deference in the context of prison disciplinary proceedings.'" *Whitehead v. Wetzel*, 720 F. App'x 657, 663 (2017) (quoting *Watson*, 834 F.3d at 425). "To determine whether the prison officials' discipline of the prisoner was within the bounds of their broad discretion, courts evaluate the 'quantum of evidence' of the underlying misconduct charges." *Id.* (citing *Watson*, 834 F.3d at 426). Where an inmate has been found guilty of the charges in a purportedly retaliatory misconduct report after a disciplinary hearing has taken place, the finding of guilt is considered strong evidence that the misconduct report was issued for a legitimate penological reason. *See Nifas v. Beard*, 374 F. App'x 241, 244 (3d Cir. 2010). A finding of guilt on a misconduct charge, combined with "a meaningful written statement of the

evidence relied on and the reasons for the action taken," establishes a "quantum of evidence" of misconduct sufficient to warrant summary judgment. *Williams v. Folino*, 664 F. App'x 144, 148-49 (3d Cir. 2016) (quoting *Watson*, 834 F.3d at 426). "Prison officials are entitled to summary judgment for disciplining a prisoner, even if their actions were motivated by animus, as long as the prisoner's offenses 'were so clear and overt' such that there was no genuine issue of material fact that the officials' actions were reasonably related to legitimate penological interests." *Batista v. Eckard*, 2018 WL 1428163, at *8 (M.D. Pa. March 22, 2018) (citing *Carter*, 292 F.3d 154).

Here, the quantum of record evidence pertaining to the misconduct report at issue is insufficient, thereby raising a genuine issue of material fact as to whether the misconduct charge against Walker was premised on a legitimate penological issue.

On August 5, 2022, Defendant Anders issued misconduct number D434133 against Walker charging him with assault and stating that Walker assaulted Anders by using his right shoulder to strike her in her left shoulder. Anders described the incident as follows:

> Verified by CCTV, inmate Walker (EP8184) was watching me behind the serving line. When I stopped at the cabinet, inmate Walker took two steps to the right and struck me in my left shoulder with his right shoulder. I notified control and my supervisor. I was then sent to medical to be assessed.

(Doc. 65-3, at 2; Doc. 87-2).

At the disciplinary hearing, Walker pled not guilty to the charge and reiterated his written version of the event—that he did not make any physical contact with Anders. (Doc. 65-3, at 4-5; Doc. 87-4). Hearing Examiner Ellenberger, after reviewing Defendant Anders'

written report, Walker's statement, and video of the incident, found that a preponderance of the evidence supported a finding of guilt. (Doc. 65-3, at 5; Doc. 87-5).

Walker appealed the misconduct, arguing that the punishment was disproportionate to the offense and that the findings of fact were insufficient to support the decision. (Doc. 65-3, at 7; Doc. 87-6). In affirming the Hearing Examiner's decision, the Program Review Committee:

> ...reviewed the misconduct report, disciplinary hearing report and subsequent appeal. The Committee notes the punishment is within the guidelines of DC-ADM 801 and finds the imposed sanctions are proportionate to the offense that Walker committed and the findings of fact are sufficient to support the [Hearing Examiner's] decision. PRC believes [Hearing Examiner's] video review of this incident[,] finds sufficient facts to support the written report of CFSI Anders[,]and declines to grant leniency. PRC is in agreement with [Hearing Examiner's] findings and disposition.

(Doc. 65-3, at 6).

Walker appealed the Program Review Committee's decision to the Superintendent, once again arguing that the punishment was disproportionate to the offense and that the findings of fact were insufficient to support the decision. (Doc. 65-3, at 9). The Superintendent "sustain[ed] the decision of the hearing examiner" and found as follows:

> I have taken the opportunity to read your instant appeal, the Program Review Committee decision, and the entire misconduct packet. In your appeal, you are requesting that the video footage be reviewed, appeal granted and the charge dismissed. You further claim, the PRC committee failed to independently review the video, which if they had would have revealed no physical contact occurred, therefore, no assault exists. You are requesting to be acquitted. Upon reviewing the misconduct packet, your appeal and misconduct history I find the hearing examiner's review of the footage and the misconduct report written by CFSI Anders, is sufficient evidence to support

> the hearing examiner's decision; furthermore, the punishment is proportionate to the offense. This type of behavior will not be tolerated and no leniency is warranted.

(Doc. 65-3, at 8).

Walker then appealed to Final Review, and the Chief Hearing Examiner upheld the responses provided by the Program Review Committee and the Superintendent as follows:

> In accordance with DC-ADM 801, § 5 (C.6), I have reviewed the entire record of this misconduct; including the misconduct report, the hearing report and related documents, your appeal to the Program Review Committee and their response, your appeal to the Superintendent and the Superintendent's response. I have also thoroughly reviewed the issues you raise to Final Review.
>
> The issues you raise to Final Review have already been addressed by the Program Review Committee and the Superintendent. On review of the record, this Office concurs with their responses. I find no persuasive basis from which to conclude that the Examiner erred in conducting the hearing. The Examiner specifically documented findings of fact based on evidence presented at the hearing to support the decision. The procedures followed were in complete accordance with DC-ADM 801. The sanction imposed is not viewed to be disproportionate to the offense, and therefore will not be amended at this level.

(*Id.* at 10).

The misconduct determination was upheld at all levels of appeal. (Doc. 65-3; Docs. 87-2, 87-4, 87-5, 87-6). It appears, however, that the PRC, the Superintendent, and the Chief Hearing Examiner did not review the video footage; they relied on the Hearing Examiner's review of the footage.

The Court has reviewed the video evidence submitted by Defendants, which contains eight separate videos, and which they contend "directly contradicts Walker[']s

claims that he avoided all contact with Anders, as it clearly shows him taking steps towards her rather than away from her." (Doc. 70, at 17; Docs. 65-1, 65-2, 68).

The first video appears to show Walker on the service line in the dining hall, leaning on the counter on the right side of the screen. (Doc. 65-1, 8-5-22 Walker EP8184 Staff Assault Video 1, at 0:00-0:15). Two other inmates and Anders are also on the right side of the screen. (*Id.* at 0:15-0:30). Around the 0:38 mark, Walker begins to walk towards the top right side of the screen. (*Id.* at 0:38-0:42). Defendants contend that, at this point, the video shows that Walker approaches Anders, takes quick steps to the right and impacts her. (Doc. 65 ¶ 15, citing Video 1 at 0:40-0:44). The Court disagrees, as the video does not show what occurred, or did not occur, between Walker and Anders. The video then shows Walker walking back towards the bottom right of the screen. (Doc. 65-1, 8-5-22 Walker EP8184 Staff Assault Video 1, at 0:52).

The second video shows a different camera angle from outside the service counter in the dining hall. (Doc. 65-2, 8-5-22 Walker EP8184 Staff Assault Video 2). Defendants contend that the video shows Walker moving past Anders and shows Anders' white hat jerking to the left from Walker body checking her. (Doc. 65 ¶ 24, citing Video 2, at 0:40-0:44). However, the opaque barrier obstructs a clear view of the service counter and obstructs what occurred behind the counter.

The remaining videos show different camera angles of inmates in the dining hall and kitchen, and officers transporting Walker through a hallway.

The Court cannot conclude that these videos either support Walker's assertion that he did not make any contact with Anders, or Anders' assertion that Walker struck her in her left shoulder. The videos certainly do not "directly contradict[] Walker[']s claims that he avoided all contact with Anders." (Doc. 70, at 17). Given the inconclusive nature of the video evidence, the Court cannot say that the videos clearly depict an assault on Anders.

The Court acknowledges "that the task of prison administrators and staff is difficult, and the decisions of prison officials require deference, particularly where prison security is concerned." *Rauser*, 241 F.3d at 334. However, in this case, given the minimal quantum of evidence supporting the guilt on misconduct number D434133, genuine issues of material fact exist as to whether there was a legitimate penological reason for the issuance of the misconduct charge, thereby precluding the award of summary judgment to Defendant Anders.

C. Fourteenth Amendment Procedural Due Process Claim against Ellenberger

Prisoners are generally afforded certain due process protections when they are accused of misconduct that may result in the loss of good conduct time, including: (1) the right to appear before an impartial decision-making body; (2) 24-hour advance written notice of the disciplinary charges against them; (3) an opportunity to call witnesses and present documentary evidence when it is consistent with institutional safety and correctional goals to do so; (4) assistance from an inmate representative if the charged inmate is illiterate or complex issues are involved; and (5) a written decision by the fact finder of the evidence

relied upon and the rationale behind the disciplinary action. *See Wolff v. McDonnell*, 418 U.S. 539, 563-67 (1974).

When reviewing the sufficiency of the evidence in a prison disciplinary proceeding, the Court must determine whether there is "any evidence in the record that could support the conclusion" reached by the hearing examiner. *Superintendent v. Hill*, 472 U.S. 445, 455-56 (1985); *see also Griffin v. Spratt*, 969 F.2d 16, 19 (3d Cir. 1992). If there is "some evidence" to support the decision, the Court must reject any evidentiary challenges by the plaintiff. *Hill*, 472 U.S. at 457. This standard is minimal and does not require examination of the entire record, an independent analysis of the credibility of the witnesses, or even a weighing of the evidence. *See Thompson v. Owens*, 889 F.2d 500, 501-02 (3d Cir. 1989).

Walker asserts a due process claim against Ellenberger for purportedly violating his right to procedural due process during the disciplinary hearing.

As a threshold matter, Defendants argue that Walker's due process claim fails as a matter of law because the sanctions imposed on Walker for the misconduct—60 days of disciplinary custody, the loss of his prison job, and a separation transfer—do not trigger due process protections. (Doc. 70, at 18 n. 2). The Court agrees. Restrictions or conditions imposed on a prisoner only trigger procedural due process protections when they impose an "atypical and significant hardship on the inmate in relation to the ordinary incidents of prison life." *Sandin v. Conner*, 515 U.S. 472, 484 (1995). None of the conditions imposed on Walker in this case trigger due process protections under this standard. *See, e.g.*, *Smith v.*

*Mensinger*, 293 F.3d 641, 654 (3d Cir. 2002) (stating that no liberty interest was triggered by seven-month placement in administrative confinement); *Walker v. Mathis*, 665 F. App'x 140, 143 (3d Cir. 2016) (holding that prisoners do not have liberty interest in prison job triggering due process protections under *Sandin*); *Sims v. Vaugh*, 189 F. App'x 139, 141 (3d Cir. 2006) (holding that "[inmate's] confinement in the RHU for a period of sixty-seven days does not state a cognizable liberty interest" and "[inmate's] transfer to another facility does not trigger the Due Process Clause"); *Murray v. Smithbower*, 2023 WL 5378839, at *3 (3d Cir. Aug. 22, 2023) (affirming dismissal of due process claim where plaintiff was sanctioned to 135 days in disciplinary custody and lost his prison job). Accordingly, Walker's due process claim fails because he has not alleged that he suffered an "atypical and significant hardship…in relation to the ordinary incidents of prison life." *Sandin*, 515 U.S. at 484.

In addition, Defendants assert that Walker's claim that Ellenberger improperly denied him the opportunity to present witnesses or to be assisted by staff is directly contradicted by the documents arising from his disciplinary hearing and the video evidence. (Doc. 70, at 17-20). The evidence reflects that Ellenberger denied Walker's request to call Food Service Director Pittsinger as a witness because he was "not present at the time of the incident." (Doc. 65-3, at 3). Further evidence reflects that Ellenberger denied Walker's request for assistance by Food Service Director Pittsinger based on Ellenberger's determination that Walker fully understood the charges against him, and that such staff assistance was not

necessary. (*Id.*). Nothing in the record suggests that Ellenberger improperly failed to call a witness or improperly denied Walker staff assistance.

The record also reveals that Ellenberger made a credibility determination. Ellenberger's decision to credit Anders' statement over Walker's statement does not constitute a violation of Walker's right to due process. *See Hill*, 472 U.S at 455 (noting that independent assessment of the credibility of witnesses is not part of a court's due process review of a disciplinary hearing officer's decision). Accordingly, the Court finds that Defendant Ellenberger is entitled to judgment in his favor on the Fourteenth Amendment procedural due process claim.

D. Claim for Damages

Walker seeks compensatory and punitive damages. (Doc. 1, at 53). Defendants argue that Walker cannot seek compensatory and punitive damages because he has not established a concrete injury and he failed to submit evidence that they acted with an evil motive. (Doc. 70, at 22-24). Considering the Court's determination that the First Amendment retaliation claim shall proceed, the Court declines to dismiss the claim for compensatory and punitive damages and will not delve into the factual determinations required for an award of punitive or compensatory damages at this stage.

## IV. Conclusion

Consistent with the foregoing, Walker's motion (Doc. 55) for partial summary judgment will be denied and Defendants' motion (Doc. 64) for summary judgment will be granted in part and denied in part.

A separate Order shall issue.

Robert D. Mariani
United States District Judge

Dated: August 28, 2026